Robert Kim Schwarz, SBN 202293
SCHWARZ LAW FIRM
28202 Cabot Road, Suite 300
Laguna Niguel, California 92677
Phone: (208) 608-0880
Email: robert@hiddenvalleylaw.com

Attorney for Defendant
DANTE GAFFIELD

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANTE GAFFIELD,<br><br>Defendant. | CR No. 25-MJ-7759-DUTY<br><br>DEFENDANT DANTE GAFFIELD'S OPPOSITION TO GOVERNMENT'S APPLICATION FOR REVIEW OF BOND ORDER<br><br>Hearing Date: December 19, 2025<br>Hearing Time: 10:00 am |

Defendant Dante Gaffield, by and through his counsel of record, Robert K. Schwarz, hereby files the instant Opposition to the Government's Application for Review of Bond Order. Defendant's filing is based on the attached; the evidence referenced in the attached; and the files, records and transcripts in this case and the other cases cited herein.

Dated: December 18, 2025            Respectfully submitted,

                                                     /s/ *Robert K. Schwarz*

                                                     Robert K. Schwarz
                                                     Attorney for Defendant,
                                                     DANTE GAFFIELD

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. Introduction

The government's Application for pretrial detention presents a narrative of danger and flight risk built not on Mr. Gaffield's actions. Instead, its detention request is premised on guilt by association, speculative inferences, and the deliberate conflation of his minimal, passive role with his co-defendants' far more serious conduct. A clear-eyed review of the proffered evidence reveals a stark truth: Mr. Gaffield's involvement was peripheral, his actions were non-violent and inchoate, and the conditions of release set by Magistrate Judge Castillo are precisely calibrated to address the limited risks he presents.

The Bail Reform Act demands a particularized analysis of the defendant before the Court. That analysis reveals a follower, not a leader; a speaker of vague intentions, not a doer of dangerous acts; and a subject of overblown allegations, not a proven violent offender. The government has not met its burden under 18 USC § 3142.

## II. Procedural History

On December 15, 2025, Mr. Gaffield appeared before the Honorable Magistrate Judge Pedro V. Castillo for his initial appearance on a two-count criminal complaint charging him with Conspiracy (18 USC § 371) and Possession of Unregistered Destructive Device (26 USC § 5861(d)). (ECF 1, 12). A contested detention hearing was held. (ECF 12). The magistrate court ordered Mr. Gaffield's release on a $10,000 unsecured surety bond with stringent conditions including location monitoring (i.e., ankle bracelet) and participation in mental health treatment. (*Id.*). The magistrate court, however, ordered the "bond stayed until December 18 by 4 pm" to permit the government a chance to seek review by that date and time. (*Id.*).

2

On December 17, 2025, the government filed its Application for Review of Bond Order (Application). (ECF 10). The government also filed an ex parte application for an order staying the release of Mr. Gaffield "pending resolution of the government's appeal of the magistrate judge's release order issued on December 15, 2025." (ECF 11). This Court stayed the magistrate's judge's release order "until [it] resolves the government's application for review of said order." (ECF 20). The Court set the review hearing for December 19, 2025. (ECF 21).

### III.  Relevant Factual Background

The following facts are drawn from the criminal complaint (ECF 1) and the government's Application (ECF 10), which represent the extent of Mr. Gaffield's alleged involvement.

1. <u>The Alleged Conspiracy</u>. In late November 2025, co-defendant Audrey Carroll provided a handwritten plan, "OPERATION MIDNIGHT SUN," to a confidential source. (ECF 1, ¶5). The plan described placing explosive devices at commercial properties on New Year's Eve. (ECF 1, ¶¶ 10-11). Critically, the plan's architect, Carroll, later stated that if the conspirators saw anyone at a target location, such as a security guard, "they would warn them." (ECF 1, ¶ 21 n.8).

2. <u>Mr. Gaffield's Introduction to the Plan</u>. On December 7, 2025, Mr. Gaffield attended a meeting with Carroll, co-defendant Zachary Page, and an undercover FBI employee (UCE). (ECF 1, ¶ 17(a)). Carroll stated she had "the plan" and handed papers to Mr. Gaffield. The government claims Mr. Gaffield and the UCE read it (i.e., "the plan").[1] (ECF 1, ¶ 17(a)). The criminal complaint contains no statements from Mr. Gaffield about the plan's content, nor any expression of agreement. When asked if his "comrades" would join, Mr. Gaffield

---

[1] In the very next paragraph, however, the criminal complaint uses the term "review" when describing what Mr. Gaffield did with the so-called "attack plans." (ECF 1, ¶ 17(b)).

3

1  responded "he would talk to them." (ECF 1, ¶ 17(b)). There is no allegation he
2  subsequently recruited anyone.

3      3. <u>Communications</u>. The conspirators used a Signal chat group. (ECF 1,
4  ¶ 17(b)). On December 10, Mr. Gaffield made his single contribution stating, "I
5  have a few burners / But im saving for the big event / The big party [celebrate
6  emoji]." (ECF 1, ¶ 18(p)). There is no evidence he ever provided a burner phone
7  to the conspiracy. Other members discussed bomb components and logistics. (ECF
8  1, ¶¶ 18(j), 18(l), 18(o), 18(q)).

9      4. <u>Events of December 12, 2025</u>. Mr. Gaffield traveled with others to the
10 Mojave Desert. (ECF 1, ¶ 21). During the drive, co-defendant Page discussed fuse
11 techniques, and Carroll explained the New Year's Eve plot. (ECF 1, ¶ 21(c)). The
12 criminal complaint does not allege any statements from Mr. Gaffield during this
13 journey. Upon arrival, Carroll, Page, and co-defendant Tina Lai unloaded and
14 began arranging bomb-making components. (ECF 1, ¶ 22). Mr. Gaffield's only
15 physical act was to "set up a tent behind the table to keep the bomb-making
16 materials and the group shaded from the sun." (ECF ¶ 22). He did not handle any
17 precursors, pipes, or other explosive materials. The FBI intervened before any
18 device was assembled, and Mr. Gaffield was arrested. (ECF 1, ¶ 22).

19     5. <u>Prior History</u>. The pretrial services report lists prior arrests. A 2020
20 felony case for assault with a deadly weapon and battery on an officer was
21 dismissed after the court **found** "Insufficient Cause." (Exhibit A, State Docket
22 LACBA4649-00-01). The other felony – Assault with a Deadly Weapon Not
23 Firearm was dismissed pursuant to California Penal Code § 1385. The remaining
24 misdemeanor count appears to have resulted in diversion. (Pretrial Services
25 Report). By way of a proffer, with respect to the 2021 warrant noted in the Pretrial
26 Services Report, undersigned's defense investigator could find no record of it.
27 Other matters were handled informally or date to his juvenile years. (Pretrial

Services Report). A permanent domestic violence restraining order was entered on December 16, 2025, after a hearing was held while Mr. Gaffield was in federal custody and unable to appear. (Exhibit B, State Docket 25WHRO02373).

IV. **The Defendant Before this Court**

Mr. Gaffield is an active member of the community, with a large network of friends and family. Mr. Gaffield's father, David Gaffield, was present during his initial detention hearing and maintains a close relationship with his son. Mr. Gaffield, an adopted member of the Gaffield family, also has two sisters: one who resides in Pasadena and another in Northern California. Mr. Gaffield's uncle and partner also reside in West Hollywood. Mr. Gaffield's sister Adrianna echoed her family's continued support: "[W]e will do everything to show support and love to Dante[.]" Adrianna also shared that her family tragically lost in the Altadena fires. She conveyed that this event, as an adoptee was "extremely triggering." (Exhibit C.)

Many of Mr. Gaffield's friends have also written in support. Emily relayed that Mr. Gaffield is a "peaceful person with a big heart," who "cooks food for our community members and passes out food at Skid Row and McArthur Park." Soloman Tanner also described, "I have seen Dante actively participate in various charitable efforts, from distributing clothes and food to offering medical supplies to those in need. His work is driven by a genuine desire to help others[.]" Javier Moro stated, "Dante would never hurt anyone since he is a kind soul and a good friend." (Exhibit C.)

Mr. Gaffield is currently enrolled in school and "has been interning and starting a nonprofit organization." (Pretrial Services Report). He resides on his own, and pays his own rent. Mr. Gaffield is not a danger to the community—he is productive, self-sufficient, and maintains a tight circle of friends and family who provide him with structure and oversight.

5

## V. Standard of Review

A district court reviews a magistrate judge's release order "de novo." *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990). But the Ninth Circuit has made clear that in this context, "the district court is not required to start over in every case, and proceed as if the magistrate's decision and findings did not exist." *Id.* at 1193. A district court "should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." *Id.*

## VI. Mr. Gaffield Should Not Be Detained Pending Trial Because He is Neither a Flight Risk Nor a Danger to the Community

### a. Applicable Legal Standards

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act mandates release of a person pending trial unless a court finds the person a flight risk or a danger to the community. 18 U.S.C. § 3142(b). The court must impose "the least restrictive further condition, or combination of conditions" it "determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). The government bears the burden of proving by clear and convincing evidence that a defendant poses a danger to the community, and by a preponderance of the evidence that a defendant is a flight risk, that cannot be mitigated through the imposition of conditions of release. "Doubts regarding the propriety of release should be resolved in favor of the defendant." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985).

Even if a person is deemed a danger or a flight risk, they "must still be released if there is a 'condition or combination of conditions that will reasonably assure" the appearance of the person and the safety of the community. *United States*

*v. Hir*, 517 F.3d 1081, 1091-92 (9th Cir. 2008) (quoting 18 U.S.C. § 3142(e)).  The Bail Reform Act "contemplates only that a[2] court be able to 'reasonably assure,' rather than guarantee" the appearance of the person and safety of the community.  *Hir*, 517 F.3d at 1092 n. 9.

     b.  <u>Argument</u>

Under 18 U.S.C. § 3142(g), the Court must consider: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the danger posed by release.  As set forth herein, an analysis of each factor weighs against detention.

### i. Factor 1: The Nature and Circumstances of the Offense Weigh Against Detention.

The government portrays a conspiracy of indiscriminate violence.  The evidence depicts a planned property crime with explicit precautions to avoid harm.

    1.  <u>The Conspirators' Expressed Intent Was to Avoid Casualties</u>.  The alleged ringleader, Audrey Carroll, explicitly instructed that if people were seen at a target, "they would warn them."  (ECF 1, ¶ 21 n.8).  This is a direct refutation of the government's claim of "utter disregard for human life."  (ECF 10 at p.11).  The plan to target businesses on New Year's Eve (when closed) and to test in the remote Mojave Desert further demonstrates a conscious design to isolate risk.  The offense, while serious, was oriented toward symbolic property destruction, not terrorism against persons.

    2.  <u>Mr. Gaffield's Personal Conduct is Several Degrees Removed from the Offense's Core</u>.  The affidavit meticulously details bomb-component handling by Carroll, Page, and Lai.  (ECF 1 ¶¶ 21-22).  In stark contrast, Mr. Gaffield's sole

---

[2] Mr. Gaffield does not concede the veracity of the information contained in the criminal complaint or the Application.  Mr. Gaffield reserves the right to challenge the government's version of facts at any evidentiary hearing and at any trial.

7

physical act was to set up a tent for shade. He transported no materials, handled no precursors, and attempted no assembly. To attribute the "nature and circumstances" of bomb-building to him is a legal error. His conduct aligns with a minor support role, not a principal in a plot of violence.

Indeed, Judge Castillo apparently carefully read the complaint and noticed the same issues because he specifically inquired as much from government:

| | |
|---|---|
| Court: | Did Mr. Gaffield have anything to do with writing or drafting these attack plans that are mentioned on the criminal complaint affidavit?[3] |
| Ms. Elbogen: | The government is not aware that the defendant wrote the plans himself. No. |
| Court: | Okay. So he reviewed them, had discussions with the co-conspirators and the confidential informant or UCE is the acronym that's used in the complaint, right? |
| Ms. Elbogen: | Well, there was both a confidential informant and an undercover. |
| Court: | Okay. Can you point me to what actually Mr. Gaffield is charged with doing as part of this conspiracy? |

The government struggled to show what active participation Mr. Gaffield engaged in during the conspiracy:

| | |
|---|---|
| Ms. Elbogen: | I can point you to on December 8th ... Okay. On page 16 of the complaint in subparagraph P, on December 10th, 2025, so two days before the planned excursion to the desert to rehearse and |

---

[3] The transcribed portions of the hearing were created by rev.com – not a certified court reporter.

detonate explosives in anticipation of the larger New Year's Eve plan, he wrote and in response to a message from co-conspirator Page indicating that they should use burner phones so as not to be discovered, he wrote, "I have a few burners, but I'm saving for the big event, the big party," and he included a celebrate emoji indicating he was aware.

Also, he was recorded by the CHS at an in person meeting on December ... that would have been December 7th, I believe, where the CHS indicated that he had reviewed the attack plans and talked about recruiting others, because as they were, the attack plans listed five locations to be hit, and then had empty lines for five additional locations if there were more comrades to detonate explosives at those locations. So he had discussed recruiting others, and that government can point to ... That would be paragraph 17B on page 10 of the complaint.

He was a member of the Signal chat group, Order of the Black Lotus, which the leader of this group, Audrey Carroll, the co-conspirator, wrote was the subgroup for everything radical. And in that group it appeared that they were planning and coordinating what to bring to the desert, including bomb parts. Additionally, he took the obviously very significant step of driving two plus hours to the desert from the Los Angeles area to then detonate explosives with his co-conspirators as a rehearsal for the main event on New Year's Eve.

When he arrived and everyone was quickly, almost immediately after they arrived, they unloaded bomb making parts, set them up on a table. Mr. Gaffield's role at that point was setting up a sort of popup tent in such a way that it shaded the table from the sun in the desert. And so, based on those actions the defendant took, which are laid out in the

> complaint, he participated in this plot and in this effort to construct a destructive device in the Lucerne Valley desert.

This oral recitation only reinforced Mr. Gaffield's minimal participation in the conspiracy. This in turn, led Judge Castillo to conclude the government had not met its high burden of clear and convincing evidence of proving danger to the community.

### ii. Factor 2: The Weight of the Evidence Against Mr. Gaffield is Exceptionally Weak.

The government's case against Mr. Gaffield is built on implication and inference, not concrete acts.

1. <u>"Reviewing" a Document is a Passive, Non-Incriminating Act</u>. The claim that Mr. Gaffield read or "reviewed" the "Operation Midnight Sun" plan proves nothing. There is no evidence he endorsed it, altered it, discussed its mechanics, or took any step to implement it. His subsequent silence in the face of detailed operational planning is telling.

2. <u>There is a Complete Absence of Evidence that He Fulfilled Any Promised Actions</u>. The government has failed to make any showing that Mr. Gaffield meaningfully participated in his co-defendants' scheme. Further, the government was unable to present evidence he took any steps in furtherance of the trivial promises he did make. The government instead cites two key statements:

- On recruitment: He said he would "talk to others" to see if "some of comrades would be on his team." (ECF 1, ¶ 17(b)). Result: No evidence of any recruitment.

- On burner phones: He stated "I have a few burners." (ECF 1, ¶ 18(p)). Result: No evidence he provided phones to the plot. The government's leap to claim he "obtained materials" is unsupported – a claim of possession is not an act of obtaining. (ECF 10 at 3).

There is no evidence these hollow promises ever came to fruition. Yet, the government asks for detention based on unacted-upon utterances.

3. <u>His Silence During Critical Operational Discussions is Deafening</u>. During the drive to the desert, Carroll explained the plot and Page discussed fuse techniques. (ECF ¶ 21). The criminal complaint records no statements from Mr. Gaffield. An active conspirator does not remain utterly silent during mission-critical discussions. This underscores his passive, follower status.

4. <u>The Conspiracy Was Interrupted at its Most Initial Stage</u>. The FBI arrested the group before any device was assembled. They lacked essential components like end caps. (ECF 1, ¶ 25 n.9). There is no evidence of technical bomb-making competence. The case against Mr. Gaffield rests on the weakest link of a chain that was never forged.

### iii.   Factor 3: The History and Characteristics of the Defendant Do Not Support a Finding of Present Dangerousness

The government's use of Mr. Gaffield's criminal history is misguided because it relies on unproven and irrelevant allegations.

1. <u>Prior Allegations Involving Law Enforcement Are Dated and Unreliable</u>. The pretrial services report lists arrests, not convictions. Key entries are from 2019-2021, when Mr. Gaffield was a juvenile or very young adult and are entitled to diminished weight. Most significantly, as noted above, the 2020 felony case for assault on an officer was dismissed by the state court after it found "Insufficient Cause." (Exhibit A, State Docket LACBA4649-00-01). The other felony – Assault with a Deadly Weapon Not Firearm was dismissed pursuant to California Penal Code § 1385. The remaining misdemeanor count appears to have resulted in diversion. (Pretrial Services Report).

2. <u>The Permanent Restraining Order Was Issued Without Mr. Gaffield's Participation Because He Was Custody</u>. The permanent order was issued after a

hearing on December 16, 2025, while Mr. Gaffield was in continuous federal custody. (ECF 10, Gov. Exhibit B). He could not appear and contest the allegations. In other words, the government is relying on a restraining order where there was no adversarial finding of fact. Accordingly, this does not constitute "clear and convincing evidence" of dangerousness in this proceeding.

### iv. *Factor 4: No Serious Danger is Posed by Release Under the Strict Conditions Imposed.*

Considering the above, any risk is minimal and can be managed.

1. <u>The Specific Threat is Neutralized</u>. The conspiracy is dismantled; its leaders are detained. The plot to which Mr. Gaffield had a tangential connection is gone.

2. <u>Conditions are Tailored and Sufficient</u>. Electronic location monitoring provides real-time oversight of his whereabouts. The $10,000 appearance bond signed by a family member creates a powerful financial and social incentive for compliance. These conditions directly mitigate any conceivable risk of flight or re-engagement.

3. <u>The Government's Fear is Speculative and Untethered from This Defendant's Conduct</u>. The government's argument is an appeal to emotion, not an assessment of Mr. Gaffield's demonstrated actions. The conditions of release are precisely calibrated to the risk his actual conduct presents.

///
///
///
///
///
///
///

## VII. Conclusion

The Court should DENY the government's Application and AFFIRM the release order of Magistrate Judge Castillo.

Dated: December 18, 2025                Respectfully submitted,

                                         /s/ *Robert K. Schwarz*
                                         Attorney for Defendant,
                                         DANTE GAFFIELD